IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-20829
_____

BARBARA BIBLE,

Plaintiff-Appellee,

versus

HARRIS COUNTY TEXAS; ET AL.,

Defendants,

HARRIS COUNTY COMMUNITY SUPERVISION
AND CORRECTIONS DEPARTMENT,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Southern District of Texas
(CA NO. H-96-4421)
_____

September 19, 2001

Before HIGGINBOTHAM and EMILIO M. GARZA, Circuit Judges, and DAVID
D. DOWD, JR.,[*] District Judge.

DOWD, District Judge:[**]

The is an appeal by defendant Harris County Community
Supervision and Corrections Department ("HCCSCD") from an Amended
Final Judgment entered by the district court on August 21, 2000,
following a jury trial and various post-verdict motions. Finding
no error, we AFFIRM.

_____

[*]District Judge of the Northern District of Ohio, sitting by
designation.

[**]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

On December 26, 1996, plaintiff/appellee ("Bible") filed her original Complaint alleging that HCCSCD refused to promote her to a Senior Probation Officer position based on her race (white) and in retaliation for reporting sexual harassment by a co-worker. Following the filing of her First Amended Complaint wherein she abandoned one of her claims,[1] Bible filed a Second Amended Complaint adding the State of Texas as a defendant.

After pre-trial proceedings which included the denial of HCCSCD's motion for summary judgment and an unsuccessful attempt at mediation, the parties proceeded to a jury trial on February 16, 1999. Following five days of testimony, each defendant moved for judgment as a matter of law under Fed. R. Civ. P. 50. HCCSCD's motion was denied and the case went to the jury. On February 24, 1999, the jury returned its verdict that Bible had not proven race discrimination, but that she *had* proven she was not selected for promotion in retaliation for her prior complaint of sexual harassment. The jury awarded no damages for back pay or lost future wages; however, it did award $200,000 for past emotional pain and suffering, loss of reputation, humiliation, loss of prestige, loss of enjoyment of life and mental anguish, as well as $6,000 for past medical expenses.

---

[1]Her original complaint alleged that the denial of her promotion was in retaliation for conduct protected under Title VII but also in retaliation for her prior exercise of her First Amendment rights. The First Amendment claim was abandoned.

HCCSCD filed another Rule 50 motion seeking judgment as a matter of law or, in the alternative, a new trial. Bible also filed a Rule 50 motion asking the trial court to award her both back pay and front pay as well as attorney's fees and costs. On May 17, 1999, the district court granted the State's earlier-filed Rule 50 motion, denied HCCSCD's new motion, and granted Bible's motion with respect to back pay. The district court heard testimony on attorney's fees and costs and, on March 31, 2000, entered final judgment for $256,000 in mental anguish damages and medical expenses, $24,665 in back pay with pre-judgment interest running from July 1, 1995, $30,313.88 in costs, $87,672.75 in attorney's fees, equitable relief in the form of an order to grant Bible "seniority credit" and to promote her to the next available Senior Probation Officer position, and post-judgment interest running from the date of judgment.

Bible then filed a Rule 59 motion to amend the judgment, seeking pre-judgment interest and additional attorney's fees. The district court granted the motion in part, allowing additional pre-judgment interest on Bible's past medical damages. On August 18, 2000, an Amended Final Judgment was filed and, on September 13, 2000, HCCSCD filed its Notice of Appeal.

On appeal, HCCSCD asserts that it was error to enter judgment in Bible's favor on the retaliation claim because she failed to offer any evidence that four out of the five decision-makers had any knowledge of her past complaint of sexual harassment by a co-

worker.    HCCSCD also asserts that the testimony at trial, while perhaps sufficient to establish some actual injury, was insufficient to support a six-figure award of damages.

II

In November 1991, Larance Coleman ("Coleman"), director of HCCSCD at the time, hired Bible as a Probation Officer I.  During her first two years of employment, Bible enjoyed her work and received satisfactory performance evaluations.  Apparently her personal life at the time was also excellent.

In January 1994, at her supervisor's request, Bible prepared an urgent motion to revoke probation of a person on the caseload of a co-worker who was on vacation.  Bible was subsequently confronted by a black male co-worker, Aubrey Pierre ("Pierre"), who disagreed with Bible's handling of the matter.  Pierre held a supervisory position in the office, but he was not Bible's supervisor and had no authority to question her actions with respect to the motion. Although the parties differ on precisely what happened, Bible testified that Pierre made repeated comments that he was going to "train" Bible so that she would never again make a similar recommendation with respect to a probation revocation. Then, after several days, Pierre confronted Bible in the hallway of their office area, cupped his hand behind her neck, pushed himself up against her so as to force contact with him from her hip to her breasts, placed his face within an inch of hers and said, "I'm going to take the time to train you today."

4

Bible was shocked and angry; she felt threatened and violated. She first tried to calm herself down and then went immediately to report the incident to her branch director, John Spears. She told him that she planned to file a grievance because she considered the incident a "sexual assault." Spears asked her to hold up, to allow him to investigate, and that he would get back to her. She agreed. Bible's husband testified that she came home from work that day extremely upset, was unable to eat, and cried herself to sleep in his arms.

Within a couple days, Spears reported to Bible that Pierre had agreed to have no personal (as opposed to professional) contact with Bible. Spears further assured Bible that Pierre would never be made her supervisor or put into a position where he could influence her career advancement. Spears told Bible that he had discussed the incident and the proposed solution with Doug January ("January"), the Director of Personnel. Bible admitted at trial that she accepted Spears' proposal and elected not to file a grievance or any other complaint. Apparently, there were no further problems with Pierre and Bible considered the matter settled. In April 1994, Bible transferred to a different office where she had no further contact with Pierre until June 1995.

At her new office, Bible regained her positive outlook. Bible continued to receive satisfactory performance reviews and was even the recipient of two awards from the Texas Corrections Association.

On April 18, 1995, Bible was promoted to the position of Probation Officer II and received a pay increase.

On April 21, 1995, HCCSCD announced that all officers with the rank of Probation Officer II who had not received certain disciplinary actions were eligible to apply for seven Senior Officer positions in the department. Bible was one of about 100 Probation Officer IIs who applied for the seven positions. She and 40 others were selected for interviews.

The promotion process was set forth in HCCSCD's Personnel and Administrative Guidelines (the "Guidelines"). It called for the review of all written applications by a promotion review committee ("PRC") appointed by the director. It also provided for the possibility of a written test, in addition to an interview. Ultimately, the PRC was to make recommendations to a Director's Committee which would make all final decisions relative to promotions.

In late May 1995, just a few days before the interviews were to begin and well after the deadline date for submitting applications, January appointed a group of five supervisors, Joshua George, Clara Perez, Aubrey Pierre, Rick Romoff, and Kathleen Williams, as the PRC. None of these persons actually reviewed the applications, as was required by the Guidelines. Instead, that review was conducted by January and an assistant, who screened all the applications using a "Senior Officer Promotion Score Sheet." These score sheets were never shown to the PRC. Although the

6

promotion procedure indicated a preference for applicants with so-called "Tier 1 and Tier 2 caseloads," which included Bible, neither January nor the PRC ever inquired as to the nature of any applicant's caseload.

The promotion process that was followed consisted of a written "knowledge" component, which accounted for 20% of each applicant's final score, and an interview by the five-person PRC, which accounted for the remaining 80% of the score. During the interview, the applicants were asked to role-play various scenarios and afterwards were scored, purportedly by consensus, on five categories: communication skills, leadership, problem solving, flexibility, and followship. None of these categories were defined and all of the applicants were not required to role-play all of the same scenarios. The PRC did not review the interviewee's work history or performance evaluations. The PRC apparently also scored the "knowledge" component, although there was no answer key or sample answer to guide the committee's scoring process. This, too, was done "by consensus." Although the PRC members took personal notes during the various interviews, these notes were collected and shredded at the end of each day by January. Immediately after each interview, the PRC would also interview an applicant's supervisor, but *only* if the supervisor was available.

There was no evidence that the process had ever been validated as a reliable indicator of an applicant's suitability for a Senior

7

Officer position.  In fact, plaintiff's trial expert testified that the process was seriously flawed because none of the components against which applicants were judged had been defined nor was there any attempt to either correlate the various role-play scenarios with the actual job duties of a Senior Officer or in any way "standardize" the answers being sought.  He testified that the entire process was highly subjective and that, in particular, a consensus-type score permitted a single PRC member to influence the whole panel.

Bible was scheduled for her interview on June 5, 1995 at 8:20 a.m.  She arrived for the written component of the test and, while she was taking it, she saw Pierre entering the interview room with four other people.  This was the first she realized that Pierre was on the PRC.  She hurriedly finished the test and went straight to Coleman's office to complain that Pierre was on the committee. Bible reminded Coleman of the arrangement whereby Pierre was supposed to have no influence over her career advancement. Coleman, who knew of this previous solution to Bible's harassment complaint, told Bible to proceed with the interview and assured her he would "take care of it."

Bible reluctantly followed Coleman's advice.  However, she testified that the interview, which was supposed to last 30 minutes, lasted only four or five minutes.  During the interview, she was seated at one end of a long table and Pierre was at the other end; the other PRC members were sitting along the sides of

8

the table facing toward Bible and away from Pierre. Bible testified that throughout the short interview Pierre rolled his eyes and otherwise gave visual cues that suggested that her answers were wrong or stupid. She got so distracted and flustered that she could not perform well. Bible also testified that she had serious concerns about the presence of Kathleen Williams on the PRC because Williams, a black female, had a reputation in the department for being prejudiced against non-blacks. When Bible left her interview, she cried.

After all the interviews were completed, HCCSCD posted the list of successful applicants. Apparently Coleman alone, not a "Director's Committee," made the final decision based on the recommendation of the PRC. Bible ranked 29th out of the 41 officers interviewed, having received a score of 35 out of a possible 100. The seven interviewees who had scored the highest (between 68 and 75.5 points) were immediately promoted; the next nine highest (between 53.5 and 66.5 points) were designated for automatic promotion as Senior Officer positions became available.

Bible filed internal grievances complaining about her non-selection. When these concluded, she filed EEOC charges of discrimination and retaliation. She ultimately filed her complaint in the district court.

III

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the

9

evidence supporting the jury's verdict." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir.), *reh'g and suggestion for reh'g en banc denied*, 49 F.3d 730 (5th Cir. 1995). A jury verdict must be upheld unless "there is no legally sufficient evidentiary basis for a reasonable jury to find" as it did. Fed.R.Civ.P. 50(a)(1). "We test jury verdicts for sufficiency of the evidence under the standards set forth in *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds*, *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) (en banc), viewing all of the evidence and drawing all reasonable inferences in the light most favorable to the verdict." *Scott v. University of Mississippi*, 148 F.3d 493, 504 (5th Cir. 1998) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (en banc), quoting *Boeing*, 411 F.2d at 374).[2]

## A.

Title VII makes it unlawful for an employer to discriminate against an employee "because [that employee] has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). "To state a claim for

---

[2]Under *Boeing*, "there must be a conflict in substantial evidence to create a jury question." 411 F.2d at 375. Substantial evidence is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Boeing*, 411 F.2d at 374; *see also Krystek v. University of Southern Mississippi*, 164 F.3d 251, 255 (5th Cir. 1999).

retaliation, a plaintiff must prove that: (1) she engaged in protected activity pursuant to Title VII; (2) she suffered an adverse employment action; and (3) a causal nexus exists between the protected activity and the adverse employment action." *Arnold v. U.S. Dept. of Interior*, 213 F.3d 193, 198 (5th Cir.), *reh'g and suggestion for reh'g en banc denied*, 232 F.3d 212 (5th Cir. 2000), *cert. denied sub nom McDaniel v. Dept. of Interior*, 121 S.Ct. 1080 (2001).

The only element of retaliation which HCCSCD has challenged is the causal nexus element. It argues that "all that Bible showed at trial was that Pierre had a motive and the opportunity to influence the other decision makers against her." HCCSCD argues that Bible did not prove that Pierre actually *did* influence the others or that the other four panelists even knew about her protected speech.

We find no merit in this argument. Bible presented sufficient evidence from which a jury could find: (1) that, despite its knowledge of Bible's previous complaint and at a time when it also knew that Bible had applied for the Senior Officer position, HCCSCD placed on the PRC the very man who had harassed Bible and about whom she had previously complained; (2) that the process used to score applicants permitted a single panel member, such as her harasser, to veto her promotion; (3) that, despite her request that her harasser be replaced on the PRC by one of any number of qualified available replacements HCCSCD refused to do so; (4) that,

11

despite her reminder to HCCSCD on the day of her interview of the previous arrangement whereby her harasser was to have no influence over her career advancement, HCCSCD required her to proceed with her interview; (5) that her harasser actively distracted her during her interview and that her interview was significantly shortened as compared to others; (6) that the unauthenticated scoring process was highly subjective; and (7) that she was a well-respected officer who was more qualified for the Senior Officer position than at least one of the applicants who were ultimately promoted over her.

From all of this, the jury certainly could have concluded that the only explanation for Bible's non-selection for promotion was retaliation by HCCSCD. The trial court did not err in its treatment of the post-verdict Rule 50 motions with respect to the retaliation claim.

### B.

HCCSCD also argues that, if the retaliation verdict stands, this Court should, in any event, reject the damages award as excessive. Our review of mental anguish damages is for abuse of discretion. *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046 (5th Cir. 1998).

HCCSCD cites *Vadie v. Mississippi State University*, 218 F.3d 365 (5th Cir.), *reh'g and suggestion for reh'g en banc denied*, 232 F.3d 212 (5th Cir. 2000), *cert. denied*, 121 S.Ct. 859 (2001), *and*

12

*cert. denied*, 121 S.Ct. 1092 (2001), for the proposition that Bible has failed to show "a 'specific discernable injury to the claimant's emotional state,' proven with evidence regarding the 'nature and extent' of the harm." *Id*. at 376 (citing *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 940 (5th Cir. 1996), *cert. denied*, 519 U.S. 1091 (1997)). *Vadie* is, however, clearly distinguishable. There, "Vadie's own testimony [was] the sole source of evidence on emotional injury." *Id*. at 377. In the instant case, Bible presented her own testimony, as well as that of her husband and a treating psychiatrist, to support her claim of emotional injury.

Bible testified that after her non-promotion due to retaliation, migraine headaches which had been in remission for four to six years returned and increased in frequency and intensity. Both she and her husband testified that she was deeply depressed; she lost interest in her Arabian horse, her cooking and her crafts; she frequently cried uncontrollably, so much so that she had to quit attending church for fear of burdening her friends with her sobbing during the services; she lost interest in sex and was treated for sleeplessness. Her husband testified that she was a different person than the one he had known for twenty years.

Dr. Axelrad, Bible's psychiatrist, testified at length regarding Bible's history, her treatment, and his diagnosis of major depressive disorder, recurrent moderate. The doctor

13

testified as to the causal connection between the retaliation and his diagnosis.  He testified regarding the severity of her injuries and the likelihood that they would continue into the future.

Finding sufficient record evidence to support the award, we find no error in the trial court's judgment with respect to damages.

IV

Having considered the issues raised by the appellant and finding no error, we AFFIRM.


Judge Garza concurs in the judgment only.

14