LAMAR, Justice,
for the Court:
¶ 1. In this sexual-harassment, due-process, gender-discrimination, and retaliation ease, we must decide whether the Circuit Court of Forrest County, Mississippi, properly ruled on a motion for judgment notwithstanding the verdict (JNOV). We find that the circuit court properly granted JNOV on the due-process, gender-discrimination, and retaliation claims, but improperly denied JNOV on the sexual-harassment claims. Therefore, we affirm in part, and reverse and render in part.
FACTS AND PROCEDURAL HISTORY
¶ 2. During the time period between July 1, 1999, and June 30, 2000, John Vincent and John Mollaghan were employed by the University of Southern Mississippi (“USM”) as coaches for the women’s soccer team under one-year contracts. Vincent and Mollaghan had been employed as the head coach and assistant coach since 1997 and 1998, respectively; however, their employment contracts had always been for one-year terms and previously had been renewed at the conclusion of the contractual time period. Both Vincent’s and Mollaghan’s contracts stated that USM reserved the right to transfer, reassign, or change the duties of the employee during the term of the contract. Ged O’Connor was the graduate assistant coach for the women’s soccer team during the 1999-2000 time period and did not have an employment contract with USM.
¶ 3. In 1999, Sonya Varnell and Richard Giannini became the senior women’s administrator for women’s sports and the USM athletic director, respectively. Vincent, Mollaghan, and O’Connor argue that Varnell and Giannini immediately made clear they preferred women to coach women’s sports, and Giannini testified that he did feel that women should coach women’s sports if women’s sports were ever to be at the same level as men’s sports. Vincent, Mollaghan, and O’Connor argue that Var-nell and Giannini immediately began to engage in conduct designed to undermine the coaches’ authority and ability to coach the soccer team. Among other complaints, they argue Varnell improperly accompanied the team to road games, became too friendly with the team members, and took control of scholarship decisions in an effort to show she had final say over the program and to undermine Vincent’s authority in the eyes of the players. They argue this conduct was designed to effectuate their removal so they could be replaced with female coaches.
¶ 4. Varnell testified that she normally traveled with the teams to their conference tournaments, but in 1999, she decided to accompany the team to a regular-season game because she was not sure the worn- *297 en’s soccer team would qualify for their tournament. In late October, Varnell accompanied the team to regular-season games in Chicago, Illinois. O’Connor alleged that he was subjected to sexual harassment by Varnell on the trip. Specifically, O’Connor testified that he was in charge of obtaining Subway sandwiches for the team prior to leaving for Chicago; however, he was unable to take Varnell’s order and subsequently did not get her a sandwich. O’Connor testified that, when he boarded the bus with the sandwiches, he told Varnell that he did not get her a sandwich, but would be glad to give her six inches of his footlong. According to O’Connor, Varnell then said “You’re so nasty, you’re so nasty.” Varnell testified that after O’Connor offered her six inches of his sandwich, Vincent stated, “I didn’t know you had six inches to give her, mate,” to which she replied, ‘You know that’s not what he meant.”
¶ 5. Ultimately, the soccer team did qualify for their conference tournament in 1999. In early November 1999, Varnell accompanied the team to the tournament in Milwaukee, Wisconsin. O’Connor alleged that he was sexually harassed by Varnell on that trip as well. Specifically, O’Connor testified that Varnell touched his arm and offered him the extra bed in her room several times after the team arrived at their hotel in Milwaukee. O’Connor testified he took that to mean Varnell was ordering him to sleep in her room and implying that she wanted to have sex with him. However, it is undisputed that Var-nell offered O’Connor her extra bed after overhearing Vincent and Mollaghan teasing O’Connor for having to share a hotel room with a man they perceived to be homosexual and after O’Connor had asked to sleep in Vincent and Mollaghan’s room. O’Connor further testified that he was not bothered by Vincent and Mollaghan’s comments because they were friends, but that Varnell’s offer of her extra bed made him uncomfortable because they did not have a close relationship. It is undisputed that Varnell did not offer O’Connor her bed and did not directly proposition him for sex. The “Subway-sandwich incident” and the “hotel-room incident” are the only two instances of sexual harassment of which O’Connor complains.
¶ 6. It is undisputed that Varnell became aware that several team members had complaints regarding the coaching staff during her trips with the team. Varnell testified that Vincent had informed her previously to expect some complaints because some upperclassmen were upset about their playing time being cut in favor of younger players. Varnell testified that, on the way home from the conference tournament, Vincent, Mollaghan, and Varnell agreed that she would interview the players individually once they returned to USM and try to sort out the problem. These interviews took place in mid-November.
¶ 7. After interviewing the players, Var-nell received a letter signed by the majority of the soccer team members outlining problems they perceived with the women’s soccer program and coaches; Varnell also received several letters complaining about the program from players’ parents. Additionally, several players threatened to leave the team. Varnell testified that the complaints amounted to much more than disputes over playing time, and that she was shocked by some of the allegations.
¶8. After completing the interviews, Varnell prepared a summary of what had transpired leading up to the student interviews and in the interviews themselves, which she distributed to Giannini, Vincent, Mollaghan, and the student athletes. Vincent testified he received a copy of this summary, as well as copies of all letters *298 received from the students and the students’ parents, in November, and that he was aware of the allegations against him. Around the same time as receiving the summary and letters, Vincent reported Varnell’s alleged sexual harassment of O’Connor.[1]
¶ 9. After Vincent received the material regarding the students’ complaints, Vincent met with Giannini and Varnell to discuss the complaints. A second meeting was held in December to address the students’ concerns regarding Vincent’s conduct, at which the soccer team, Varnell, Giannini, Mollaghan, O’Connor, Vincent, his wife, and his child were present. The second meeting was not productive, and in mid-December, Vincent was reassigned, as his contract allowed, to a teaching position at USM. Varnell and Giannini testified that Vincent was reassigned because they felt the program had been compromised and Vincent had lost his ability to lead the team. On December 22, 1999, Vincent filed a grievance alleging that Varnell improperly had interfered with the soccer program and that Giannini had reassigned him without a hearing. Vincent never received a hearing on his grievance. Vincent remained in a teaching position until his contract expired on June 30, 2000, and his contract was not renewed.
¶ 10. After Vincent was reassigned in December 1999, Mollaghan was promoted to interim head coach. Although he applied for the position of head coach, and interviewed twice, Matt Clark, a male who was the head coach for Auburn University at the time, was ultimately hired as head coach for the women’s soccer team and remained in that position for four years. Giannini and Varnell testified that Clark was hired because he felt Clark was the most qualified candidate with the most experience, and it is undisputed that Clark was qualified for the position of head coach.
¶ 11. In April 2000, during the interview process for head coach, Mollaghan received an unfavorable annual review from Varnell, which he felt contributed to his not being hired as head coach. Molla-ghan filed a grievance over his annual review on May 7, 2000, but he testified that he never received a reply, as he felt he was entitled to under USM’s staff handbook. Mollaghan filed a second grievance on May 19, 2000, alleging improper conduct between Varnell and the student athletes, but he testified that he never received a hearing on his second grievance either. Mollaghan testified that it was his position that his May 19 grievance constituted a complaint about Varnell’s alleged sexual harassment of O’Connor, as he believed the two instances fell under the general grievance of improper conduct.
¶ 12. Ultimately, Mollaghan accepted a coaching position with Spring Hill College prior to his contract with USM expiring. According to Mollaghan, he took the job because he was not sure his contract would be renewed and he was concerned that he might have to return to the United Kingdom if he was out of work for more than thirty days, because he was in the United States on a work visa. After Mollaghan took the job with Spring Hill, USM extended his contract for thirty days so that he would not have any problems with his visa. Vincent and Mollaghan’s employment contracts were not terminated early, and they were paid the full monetary amount due under their contracts.
¶ 13. After Vincent was reassigned and Mollaghan was promoted to interim head coach, O’Connor continued in his position *299 as graduate assistant coach for the women’s soccer team. O’Connor eventually resigned his position as graduate assistant coach, effective July 28, 2000, to accept a position at the University of Louisiana-Monroe.
¶ 14. Vincent, Mollaghan, and O’Connor filed suit against USM and Varnell, Giannini, and Dr. Horace Fleming (the former president of USM),[2] in their individual and official capacities, asserting various federal and state-law claims. The cases were consolidated for discovery and trial. Prior to trial, Varnell, Giannini, Fleming, and USM filed a joint motion for summary judgment, which the circuit court granted in part and denied in part.[3] Specifically, the circuit court granted the defendants’ motion for summary judgment on all claims except for O’Connor’s sexual-harassment claim brought against Varnell in her individual capacity under 42 U.S.C. § 1983; Vincent’s and Mollaghan’s procedural due-process claims asserted against Varnell, Giannini, and Fleming in their individual capacities; and Vincent’s, Mollaghan’s, and O’Connor’s gender-discrimination and retaliation[4] claims asserted under Section 1988 against Varnell and Giannini in their individual capacities.[5]
¶ 15. After trial, the jury returned verdicts in favor of Vincent, Mollaghan, and O’Connor. As to Vincent, the jury found that Giannini and Varnell had discriminated against him because he was male, that Giannini and Varnell had retaliated against him because he had reported O’Connor’s sexual harassment allegations, and that he had been denied his due-process rights by Fleming, Giannini, and Varnell because he did not receive a hearing he contended he was entitled to under the staff handbook. The jury awarded Vincent $500,000. As to Mollaghan, the jury found that Giannini and Varnell had discriminated against him because he was male, that Giannini and Varnell had retaliated against him because he had reported O’Connor’s sexual harassment allegations, and that he had been denied his procedural due-process rights by Giannini, and Var-nell because he did not receive a hearing he contended he was entitled to under the staff handbook. The jury awarded Molla-ghan $376,000. As to O’Connor, the jury found that Giannini and Varnell had discriminated against him because he was male, that Varnell’s conduct had constituted sexual harassment against O’Connor, and that Varnell and Giannini had retaliated against him because he had filed a sexual-harassment grievance. The jury awarded O’Connor $300,000.
¶ 16. After trial, Varnell, Giannini, and Fleming filed a Joint Motion for Judgment Notwithstanding the Verdict, or, Alternatively, for a New Trial as to the Separate Plaintiff John Vincent, which the circuit court granted in part and denied in part. Specifically, the circuit court denied Var-nell’s motion for JNOV as to O’Connor’s sexual-harassment claim, finding that it could not say the. evidence of sexual harassment was so deficient that the ne *300 cessity for a jury had been obviated.[6] However, the circuit court found insufficient evidence to support the jury’s verdicts in favor of Vincent and Mollaghan on their procedural due-process claims, insufficient evidence to support the jury’s verdicts in favor of Vincent, Mollaghan, or O’Connor on their gender-discrimination claims, and insufficient evidence to support the jury’s verdicts in favor of O’Connor, Vincent, or Mollaghan on their retaliation claims, and granted the defendants’ motion for JNOV on these claims.
¶ 17. Varnell appealed the circuit court’s denial of her motion for JNOV on O’Connor’s sexual-harassment claim; Vincent and Mollaghan appealed the circuit court’s grant of JNOV on their gender-discrimination, retaliation, and due-process claims. O’Connor did not perfect an appeal.
¶ 18. We find that O’Connor did not present sufficient evidence to support the jury’s verdict on his sexual-harassment claim; therefore, we reverse the circuit court’s denial of JNOV on that claim and render judgment in favor of Varnell. We further find that Vincent and Mollaghan did not present sufficient evidence to support the jury’s verdicts on their claims of gender-discrimination, retaliation, or deprivation of procedural due process; therefore, we affirm the circuit court’s grant of JNOV on these claims.
DISCUSSION
A. Standard of Review
¶ 19. We review a trial court’s decision to grant JNOV de novo.[7] A motion for JNOV tests “the legal sufficiency of the evidence, not the weight of the evidence supporting the verdict.”[8] We are required to view the evidence in the light most favorable to the nonmoving party.[9] Essentially, we must ask “whether the evidence, as applied to the elements of a party’s case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.” [10] Furthermore, if a plaintiff fails to establish the prima facie elements of his claim, “JNOV is proper."[11]
13. Sexual Harassment
¶ 20. Varnell argues that the circuit court erred in denying her motion for JNOV on O’Connor’s sexual-harassment claim asserted against her under Section 1983.[12] In order to state “a viable claim under § 1983, ‘a plaintiff must (1) *301 allege a violation of rights secured by the Constitution of laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.’ ”[13] Sexual harassment is actionable under Section 1983.[14]
¶ 21. Importantly, the Supreme Court has clearly stated that a plaintiff claiming sexual harassment “must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted ‘discrimination] ... because of ... sex.’ ”[15] A sexual-harassment claim may be either quid pro quo or based on an alleged hostile working environment. To succeed on a quid pro quo claim, a plaintiff must show that “(1) he suffered a tangible employment action and (2) the tangible employment action resulted from his acceptance or rejection of his supervisor’s alleged sexual advances.”[16] O’Connor presented no evidence at trial that would support a finding that he had suffered a “tangible employment action” as a result of his rejection of Varnell’s alleged sexual advances. Therefore, the circuit court’s ruling focused on whether O’Connor had presented sufficient evidence to prevail on a sexual-harassment claim based on a hostile work environment. Likewise, we focus our analysis on whether the trial court properly denied Varnell’s motion for JNOV on the basis of hostile work environment.
¶ 22. To succeed on a hostile-work-environment claim, a plaintiff must show “five elements: (1) the plaintiff belongs to a protected group; (2)[he] was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment affected a term, condition, or privilege of [his] employment; and (5)[his] employer knew or should have known of the harassment and failed to take prompt remedial action.”[17] To show a discriminatory change in terms, conditions, or privileges of employment, a plaintiff must prove that the sexually objectionable conduct complained of was so “severe or pervasive” that it “destroys a protected classmember’s opportunity to succeed in the workplace.”[18] Furthermore, “a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so.”[19]
¶ 23. The U.S. Supreme Court has emphasized that “simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment.’ ”[20] While we *302 recognize that the determination as to whether sexual harassment affects a term or condition of employment is not an “exact science,”[21] courts “look to (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating as opposed to a mere offensive utterance; (4) whether it unreasonably interferes with an employee’s work performance; and (5) whether the complained-of conduct undermines the plaintiffs work place competence.”[22]
¶ 24. In denying Varnell’s motion for JNOV, the circuit court determined that the evidence of sexual harassment was not so deficient “that the necessity of the trier of fact had been obviated.” We disagree. O’Connor complained of only two instances in which he claims Varnell sexually harassed him. Neither of those instances involved physically threatening conduct nor did they interfere with O’Connor’s work performance. Viewed in the light most favorable to O’Connor, the Subway sandwich incident involved Varnell saying “You’re so nasty, you’re so nasty,” after O’Connor offered her six inches of his foot-long sandwich. The hotel incident involved Varnell touching O’Connor’s arm and offering him the extra bed in her room after she heard other coaches teasing O’Connor about spending the night in a hotel room with another man they suspected to be homosexual, and after she heard O’Connor express his discomfort with the hotel arrangements. It was never alleged that O’Connor felt sexually harassed by Varnell at any time other than these two incidents.
¶ 25. The Fifth Circuit Court of Appeals has held conduct much worse than Varnell’s to be neither severe nor pervasive enough to constitute an actionable hostile-work-environment claim. In Shepherd v. Comptroller of Public Accounts, the Fifth Circuit found that a coworker’s comments to an employee that “your elbows are the same color as your nipples,” that “you have big thighs” while simulating looking under her dress, trying to look down her clothing, touching her arm on several occasions and rubbing his hand down her arm, and remarking on two occasions when the employee arrived late to a meeting, saying “here’s your seat” while patting his lap, were not, as a matter of law, pervasive or severe enough to constitute a hostile work place.[23]
¶ 26. In Hockman v. Westward Communications, LLC, the Fifth Circuit held, as a matter of law, that the appellant could not establish a hostile-work-environment claim based upon her allegations that a coworker had slapped her on the behind with a newspaper, had grabbed or brushed against her breasts and behind, had asked her to come to work early so they could be alone, and once had held her cheeks and attempted to kiss her, because the conduct was not severe or pervasive enough to affect the terms, conditions or privileges of her employment.[24] Likewise, the Fifth Circuit held in Russell v. University of Texas of the Permian Basin, 234 Fed. Appx. 195 (5th Cir.2007), that an employee’s allegations that a coworker twice had rubbed the side of her hand and thigh, twice had implied that she wanted to move to New York City with the employee, once had said she wanted to watch a movie in bed with the employee, and had called the employee “honey” and “babe” on numer *303 ous occasions did not constitute an actionable sexual-harassment claim because the allegations were “no more severe than those in previous cases where this court has held that the employee did not demonstrate a hostile work environment.”[25]
¶ 27. We find, as a matter of law, that O’Connor did not present sufficient evidence to support a jury’s finding that the two incidents complained of were either severe or pervasive enough to amount to discriminatory changes in the terms, conditions, or privileges of his employment. Rather, we find that the two incidents, viewed in the light most favorable to O’Connor, amounted to no more than “simple teasing, offhand comments, and isolated incidents,” which the Supreme Court has clearly stated are not actionable under Title VII, and, by extension, not actionable under Section 1983.[26] Therefore, we find the circuit court erred in denying Varnell’s motion for JNOV on the sexual-harassment claim, and we reverse and render judgment in Varnell’s favor.
C. Due Process
¶ 28. The circuit court correctly held on summary judgment that Vincent and Mollaghan had no constitutionally protected property interest in continued employment with USM under Mississippi law.[27] The circuit court also granted summary judgment on Vincent’s claim he was deprived of unspecified liberty interests. The only due-process claims allowed to go to trial were Vincent and Mollaghan’s claims that they were deprived of their right to procedural due process during the terms of their 1999-2000 contracts. Vincent and Mollaghan have not appealed the summary judgment order.
¶ 29. Vincent and Mollaghan argue that the circuit court erred by granting JNOV and finding the evidence was insufficient to support a jury verdict on their procedural-due-process claim. We have held that, to prevail on a procedural-due-process claim, a plaintiff must prove “(1) he was deprived of a protected property interest and (2) he was denied the process due him.”[28] The Supreme Court has explained, “the Fourteenth Amendment’s procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits.”[29] The Supreme Court additionally described a protected property interest as being:
more than an abstract need or desire for [a benefit]. [A person] must have more than a unilateral expectation of it. He must, instead, have a legitimate claim or entitlement to it.[30]
Property interests are created and defined by state law.[31] Therefore, to determine whether Vincent or Mollaghan was deprived of his right to procedural due process under the terms of his contract at *304 issue, we must first determine whether Vincent or Mollaghan was deprived- of a protected property interest in his 1999-2000 contract, as defined by Mississippi law.
¶ 80. Vincent and Mollaghan argue that they were entitled to a hearing and investigation on their grievances under their employment contracts and USM’s staff handbook. They further allege that their rights to procedural due process were violated because they were not provided such a hearing or investigation. However, assuming arguendo that Vincent and Molla-ghan were entitled to a hearing and/or investigation on their grievances, which they did not receive, neither Vincent nor Mollaghan has identified any protected property interest in his 1999-2000 employment contract that he lost as a result.[32]
¶ 81. The evidence is undisputed that Vincent and Mollaghan’s 1999-2000 employment contracts were not terminated early, and that both were fully compensated under their contracts at issue in this case.[33] As neither Vincent nor Mollaghan suffered any property loss under his contract, neither can show the deprivation of a property right or that he suffered any compensable damage as the result of his alleged deprivation of procedural due process. Therefore, we find that there was insufficient evidence to support the jury verdicts in their favor, and we affirm the circuit court’s order granting JNOV on these claims.
D. Gender Discrimination
¶ 32. Vincent and Mollaghan argue that the circuit court erred in granting the defendants’ motion for JNOV on their claims of gender discrimination asserted under Section 1983 against Varnell and Giannini. Title VII of the Civil Rights Act of 1964 makes it “unlawful” for “an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s ... sex.”[34] To show a prima facie ease of discrimination, “a plaintiff must prove that: (1)[he] is a member of a protected class; (2)[he] was qualified for the position that [he] held; (3)[he] was discharged; and (4) after being discharged, [his] employer replaced him with a person who is not a member of the protected class.”[35]
¶ 33. In this case, Vincent and Molla-ghan argue they were discharged because of their gender. However, the evidence, taken in the light most favorable to both Vincent and Mollaghan, did not show that either was “discharged” — Vincent remained employed by USM until his contract expired, and his contract was not renewed; Mollaghan accepted another position prior to the expiration of his con *305 tract, which actually was extended for thirty days. Furthermore, assuming ar-guendo that Vincent and Mollaghan did make a prima facie showing that they were “discharged,” the evidence is undisputed that neither Vincent nor Mollaghan was replaced with a female. Vincent was replaced as head coach with Mollaghan, and Mollaghan was replaced as interim head coach with Matt Clark. Vincent and Mollaghan argue they were “ultimately” replaced with a female because USM hired a female to replace Matt Clark as head coach after four years.
¶ 34. We find that neither Vincent nor Mollaghan presented sufficient evidence to establish a prima facie case of gender discrimination.[36] Therefore, we affirm the circuit court’s grant of JNOV on these claims.
E. Retaliation
¶ 35. Vincent and Mollaghan argue that the circuit court erred in granting JNOV on their retaliation claims asserted under Section 1983, alleging they were retaliated against for reporting the alleged sexual harassment. To establish a prima facie case for retaliation, a plaintiff must show “(1) that [he] engaged in activity protected by Title VII,[37] (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action.”[38] An employee engages in a protected activity, among other ways, if he opposes any practice made unlawful under Title VII.[39] To show adverse employment action, “a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, “which in this context means it well might have “dissuaded a reasonable worker from making or supporting a charge of discrimination.” ’ ”[40]
¶ 36. When considering a retaliation claim, courts apply burden-shifting analysis originally articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once a plaintiff establishes a pri-ma facie case for retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.[41] If the defendant produces a nondiscriminatory reason, then the burden shifts back to the plaintiff to prove that he would not have suffered the adverse action “but-for” the protected activity.[42] “In other words, even if a plaintiff’s protected conduct is a substantial element in a defendant’s decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct.”[43] Im *306 portantly, temporal proximity between the protected activity and the adverse employment action, standing alone, cannot be “sufficient proof of but-for causation.”[44]
¶ 37. Vincent and Mollaghan argue that the “but-for” test is no longer required for a plaintiff to prevail on a retaliation claim, and that they could succeed as long as they could show their protected activity was a “motivating factor” and the employer had a “mixed motive” for the adverse employment action, citing Smith v. Xerox Corp., 602 F.3d 320 (5th Cir.2010).
¶ 38. However, the “motivating factor” test applies only at the prima facie stage of the case.[45] There are differing standards of causation within the McDonnell Douglas framework, and the standard of causation is more stringent with regard to the ultimate question of whether the protected activity was a “but-for” cause of the adverse employment decision.[46] As the Fifth Circuit has recognized, the “mixed-motive approach as applied in the retaliation context preserves an employer’s ability to escape liability by refuting but-for causation.”[47] The “mixed motives” or “motivating factor test” is “best viewed as a defense for an employer — once the employee presents evidence that an illegitimate reason was a motivating factor, even if not the sole factor for the challenged employment action — to show that it would have made the same decision even without consideration of the prohibited factor.”[48]
¶ 39. However, once a trial on the merits has occurred, as in this case, the “adequacy of each party’s showing at each stage of the McDonnell Douglas ritual is unimportant.”[49] The only question we need consider is “whether the plaintiff has met his ultimate burden of proving that the adverse employment action complained of resulted from retaliatory intent.”[50] That is, did Vincent and Mollaghan present sufficient evidence to show that the complained — of employment actions would not have occurred in the absence of their protected activities?
1. Vincent’s Claim
¶ 40. Vincent argues that he suffered adverse employment action when he was reassigned and his contract was not renewed, after he engaged in protected activity by reporting Varnell’s alleged sexual harassment of O’Connor. Assuming arguendo that Vincent’s reassignment from head coach of the women’s soccer team to a teaching position[51] and the non-renewal of his contract were materially adverse employment actions, Vincent has presented insufficient evidence to show that the employment actions would not *307 have occurred if he had not reported the alleged sexual harassment.
¶ 41. Vincent argues that he was reassigned shortly after he reported the alleged sexual harassment. However, it is undisputed that Varnell received complaints from several members of the women’s soccer team regarding Vincent’s coaching performance and conduct in early November 1999, before Vincént reported the alleged sexual harassment. The student athletes were interviewed separately to investigate their complaints and to attempt to resolve the matter. Vincent did not report the alleged sexual harassment until after the interviews took place, around the same time as he received a summary of what Varnell had discovered during the interviews.
¶ 42. In December 1999, after Vincent reported the alleged sexual harassment, Giannini, Vincent, and Varnell met to address the athletes’ concerns. Vincent was not removed as head coach until after a second, unsuccessful meeting to address the complaints about Vincent. Although the evidence, taken in the light most favorable to Vincent, showed that he was reassigned some time after he reported Varnell’s alleged sexual harassment, the evidence also showed that Varnell and Giannini were aware of and investigating student-athlete complaints regarding Vincent’s coaching conduct prior to Vincent’s reporting the alleged sexual harassment. Furthermore, Varnell and Giannini testified that Vincent was reassigned and his contract was not renewed because of the numerous complaints received from student athletes and their parents regarding Vincent’s coaching conduct, and Vincent’s inability to repair his relationship with the student athletes. Vincent provided no evidence to refute these reasons.
¶ 43. In short, Vincent has not presented sufficient evidence that he would not have been reassigned and his contract would have been renewed had he not reported Varnell’s conduct. Therefore, we find that there was insufficient evidence to support the jury’s finding on Vincent’s retaliation claim, and we affirm the circuit court’s grant of JNOV.
2. Mollaghan’s Claim
¶ 44. Mollaghan argues he suffered an adverse employment action, ie., not being hired as the head coach for the women’s soccer team, because he filed a grievance alleging Varnell had engaged in improper conduct. However, Mollaghan failed to present evidence that he suffered any adverse employment action. The evidence is undisputed that Mollaghan was promoted to interim head coach and remained interim head coach after he had filed his grievance. He remained interim head coach until he accepted a position at another school before his contract expired. Furthermore, his contract was extended for thirty days after he filed his grievance to ensure he did not have any problems with his work visa while he switched employers.
¶ 45. To the extent that Mollaghan alleges he experienced adverse employment action when he was not selected as head coach, he also failed to present sufficient evidence to prove a casual link between his protected conduct and the adverse action. For a plaintiff to prove his protected conduct was the “but-for” cause of his not being selected for a certain position, a plaintiff must prove that he was the “clearly better qualified” candidate for the position.[52] In other words, a plaintiff must show that “the disparities in qualifications are of such weight and significance that no reasonable person, in the exercise of im *308 partial judgment, could have chosen the selected candidate over the plaintiff for the job in question.”[53]
¶46. Although the evidence, taken in the light most favorable to Mollaghan, showed that he was qualified for the position, it did not meet the standard to show he was the “clearly better qualified” candidate. The evidence showed that Giannini hired Clark because he believed Clark was the most qualified candidate with the most experience, and Mollaghan presented no evidence to dispute Varnell and Giannini’s testimony that Clark was the most qualified candidate. Therefore, we find there was insufficient evidence for the jury to find in favor of Mollaghan on his retaliation claim, and we affirm the circuit court’s grant of JNOV on Mollaghan’s retaliation claim.
CONCLUSION
¶ 47. We find that there was insufficient evidence to support the jury’s verdict in favor of O’Connor on his sexual-harassment claim; therefore, we reverse the circuit court’s order denying Varnell’s motion for JNOV on that claim and render judgment in her favor. We also find that there was insufficient evidence to support the jury’s verdicts in favor of Vincent and Mollaghan on their claims asserting deprivation of their procedural-due-process rights, gender discrimination, and retaliation. Therefore, we affirm the circuit court’s order granting the defendants’ motion for JNOV on these claims. The judgment of the Circuit Court of Forrest County, is affirmed in part and reversed and rendered in part.
¶ 48. ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: REVERSED AND RENDERED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, KITCHENS, CHANDLER AND KING, JJ„ CONCUR. PIERCE, J., NOT PARTICIPATING.

. O'Connor formally filed a written grievance regarding Varnell's alleged sexual harassment on April 20, 2000, four to five months after the complained-of conduct occurred.

. Only Vincent asserted a claim against Fleming in his individual capacity.

. The circuit court’s order on the defendants' motion for summary judgment has not been appealed.

. The circuit court noted that, while it appeared to the circuit court that only O’Connor had pleaded a retaliation claim in his complaint, the defendants conceded that Vincent and Mollaghan also had asserted retaliation claims.

.The only state-law claim allowed to go to trial was O’Connor’s claim of tortious interference with his employment contract at the University of Louisiana-Monroe, which is not at issue in this appeal.

. The circuit court also left the jury’s damages award to O'Connor undisturbed, even though it was based upon the jury’s verdict in his favor on three claims, two of which were overturned.

. Wilson v. General Motors Acceptance Corp., 883 So.2d 56, 63 (Miss.2004) (citations omitted).

. Id.

. Id.

. Estate of Jones v. Phillips, 992 So.2d 1131, 1146 (Miss.2008) (citations omitted).

. Wilson, 883 So.2d at 63 (citations omitted).

.While Mississippi courts may exercise jurisdiction over federal claims brought under Section 1983, the elements of the claims and defenses against them are governed by federal law. East Mississippi State Hosp. v. Callens, 892 So.2d 800 (Miss.2004) (citation omitted). Furthermore, "[sjection 1983 and Title VII [of the Civil Rights Act of 1964] are ‘parallel causes of action’ therefore, the inquiries and standards for claims brought under Section 1983 and Title VII are the same. Lauderdale v. Texas Dep’t of Criminal Justice, Institutional Div., 512 F.3d 157, 166 (5th Cir.2007) (quoting Cervantez v. Bexar County Civil Serv. Comm’n, 99 F.3d 730, 734 (5th Cir.1996)).

. Lauderdah v. Texas Dep’t of Criminal Justice, Institutional Div., 512 F.3d 157, 165 (5th Cir.2007) (quoting Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 525 (5th Cir.1994)). The parties do not dispute that the defendants were acting under color of state law at the time of the conduct giving rise to the plaintiffs’ various Section 1983 claims.

. Lauderdale, 512 F.3d at 165-66.

. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (emphasis in original).

. La Day v. Catalyst Tech., Inc., 302 F.3d 474, 481 (5th Cir.2002).

. Hockman v. Westward Commc'ns., LLC, 407 F.3d 317, 325 (5th Cir.2004) (citation omitted).

. Id. at 326 (citation omitted).

. La Day, 302 F.3d at 482.

. Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citations omitted).

. Mire v. Texas Plumbing Supply Co., 286 Fed.Appx. 138, 141 (5th Cir.2008).

. Hockman, 407 F.3d at 325-26 (citation omitted).

. Shepherd v. Comptroller of Public Accounts, 168 F.3d 871, 872-75 (5th Cir.1999).

. Hockman, 407 F.3d at 328-29.

. Id. at 205.

. Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (citations omitted).

. See Wicks v. Miss. Valley State Univ., 536 So.2d 20, 23 (Miss.1988) (nontenured college teacher has no protected property interest in his job); Suddith v. Univ. of S. Miss., 977 So.2d 1158, 1170 (Miss.Ct.App.2007) ("nontenured faculty, whether they be tenure-track or non-tenure-track, do not have a protected property interest in continued employment either by legislation or regulations") (citations omitted).

. Akins v. Miss. Dep’t of Revenue, 70 So.3d 204, 208 (Miss.2011) (citation omitted).

. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576, 92 S.Ct. 2701, 2708, 33 L.Ed.2d 548 (1972).

. Id. at 577, 2709.

. Id.

. To the extent that Vincent argues he lost his property right to continue as the head coach of the women's soccer team until his contract expired, without an opportunity for a hearing, this issue is without merit. Vincent’s contract clearly allowed him to be reassigned and did not guarantee that he would serve as head coach through the entirety of the contractual period; therefore, Vincent had no enforceable contractual right to the position of head coach.

. Vincent and Mollaghan argue they could have "retained their positions” had they been afforded a hearing on their grievances; however, as the circuit court found on summary judgment, neither had a protected property interest in continued employment with USM.

. 42 U.S.C.2000e-2(a)(l). As previously stated, Section 1983 and Title VII are parallel causes of action, and the inquiries and standards are the same for claims asserted under either statute. Lauderdale, 512 F.3d at 165-166.

. Meinecke v. H & R Block of Houston, 66 F.3d 77, 83 (5th Cir.1995).

. See Dean v. Property One Inc., 51 Fed.Appx. 929 (5th Cir.2002) (holding that female plaintiff who produced no evidence she was replaced by a male, failed to "establish a prima facie case for gender discrimination”).

. Section 1983 and Title VII are parallel causes of action, and the inquiries and standards are the same for claims asserted under either statute. Lauderdale, 512 F.3d at 165— 166.

. Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir.1996) (citation omitted).

.42 U.S.C.2000e-3(a).

. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (citations omitted).

. Long, 88 F.3d at 304-05.

. Nunley v. City of Waco, 440 Fed.Appx. 275 (5th Cir.2011).

. Long, 88 F.3d at 305 n. 4 (citing Jack v. Texaco Research Ctr., 743 F.2d 1129, 1131 (5th Cir.1984)).

. Strong v. Univ. Healthcare Sys., 482 F.3d 802, 808 (5th Cir.2007) (citation omitted).

. Nunley, 440 Fed.Appx. at 281.

. Id.See also McDonnell Douglas, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; Strong, 482 F.3d at 808 (recognizing that temporal proximity, standing alone, could be enough to make out a prima facie case for retaliation, but is not enough to be sufficient proof of but-for causation).

. Nunley, 440 Fed.Appx. at 281.

. Xerox, 602 F.3d at 333.

. Rubinstein v. Administrators of Tulane Educ. Fund, 218 F.3d 392, 402 (5th Cir.2000) (quoting Molnar v. Ebasco Constructors, Inc., 986 F.2d 115, 118 (5th Cir.1993).

. Rubinstein, 218 F.3d at 402.

. See Burlington Northern, 548 U.S. at 70-71, 126 S.Ct. at 2416-17 (finding that reassignment of employment responsibilities can constitute retaliatory discrimination under certain circumstances).

. Sabzevari v. Reliable Life Ins. Co., 264 Fed.Appx. 392, 396 (5th Cir.2008).

. Gillaspy v. Dallas Indep. Sch. Dist., 278 Fed.Appx. 307, 313 (5th Cir.2008).